**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **Birim Group, LLC,** a California Limited Liability Company, Assignee, <div align="center">**Plaintiff,**</div> <div align="center">vs.</div> **Paa Kwesi Nduom**, a.k.a. Dr. Paa Kwesi Nduom, Papa Kwesi Nduom, Kwesi P. Nduom, an individual; **GN Bank**, an Illinois Federally-chartered Financial Institution; **International Business Solutions, LLC,** a Virginia Limited Liability Company; **GROUPE NDUOM USA LLC**; a Nevada company; **GN USA LLC**, a Nevada company; **GN Money, LLC**, a Nevada company**; Groupe Nduom**, a Ghana company; **GN Bank**, a Ghana company; **Gold Coast Fund Management**, a.k.a. Blackshield Capital Management, a Ghana company; **Yvonne Nduom**, an individual; **Nana Kweku Nduom**, an individual; **Edjah Nduom**, an individual, **Nana Aba Nduom**, an individual; **Robert Klamp**, an individual; **James L. Buckner**, an individual; **Lisa Finch**, an individual; **Francis Baffuor**, an individual; **William C. Goodall**, an individual; **Donald Davidson**, an individual and DOES 1 through 100, inclusive**,** <div align="center">**Defendants.**</div> | **CASE NO.:** 1:20-cv-07198 <br> 1. Federal Civil RICO (18 U.S.C. § 1962) Money Laundering, Wire & Mail Fraud <br> 2. Conspiracy to Violate Federal Civil RICO (18 U.S.C. § 1962(d)) <br> 3. Breach of Contract <br> 4. Fraud – Promissory Fraud <br> 5. Fraud – Intentional Misrepresentation <br> 6. Fraud – Negligent Misrepresentation <br> 7. Fraud – Concealment <br> 8. Negligence <br> 9. Conversion <br> 10. Interference with Contractual Relations <br> 11. Interference with Prospective Economic Advantage <br> 12. Breach of Contract <br> 13. Fraud – Promissory Fraud <br> 14. Fraud– Intentional Misrepresentation <br> 15. Fraud – Negligent Misrepresentation <br> 16. Fraud – Concealment <br> 17. Negligence <br> 18. Conversion <br> 19. Interference with Contractual Relations <br> 20. Interference with Prospective Economic Advantage <br><br> **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| I. | **INTRODUCTION AND SUMMARY OF ACTION** | 1 |
| II. | **JURISDICTION AND VENUE** | 3 |
| III. | **PARTIES** | 3 |
| | A. Plaintiff | 3 |
| | B. Defendants | 4 |
| | C. Doe Defendants | 13 |
| | D. Alter Ego, Agency, Aiding and Abetting and Conspiracy | 13 |
| IV. | **FACTS COMMON TO ALL CAUSES OF ACTION** | 17 |
| | A. Bank of Ghana and Ghana Securities and Exchange Commission Findings and License Revocation | 19 |
| | B.  Assignor Mavis Amanpene Sekyere | 22 |
| | C.  Assignor Nana Kwame Twum Barimah | 24 |
| V. | **CAUSES OF ACTION** | 25 |
| | 1. First Cause of Action – Federal Civil RICO (18 U.S.C. §1962) Money Laundering, Wire and Mail Fraud, etc. | 25 |
| | 2. Second Cause of Action  – Conspiracy to Violate Federal Civil RICO (18 U.S.C. §1962(d)) | 38 |
| | **(Claims Derived From Wrongful Acts Against Mavis Amanpene-Sekyere)** | |
| | 3. Third Cause of Action – Breach of Contract | 39 |
| | 4. Fourth Cause of Action –  Fraud | 41 |
| | 5. Fifth Cause of Action – Intentional Misrepresentation | 43 |
| | 6. Sixth Cause of Action –  Negligent Misrepresentation | 44 |
| | 7. Seventh Cause of Action – Fraud by Concealment | 45 |
| | 8. Eighth Cause of Action – Negligence | 46 |
| | 9. Ninth Cause of Action – Conversion | 47 |
| | 10. Tenth Cause of Action – Interference with Contractual | 48 |
| | 11. Eleventh Cause of Action – Interference with Prospective Economic Advantage | 49 |

**(Claims Derived From Wrongful Acts Against Nana Kwame Twum Barimah)**

12. Twelfth Cause of Action – Breach of Contract     50

13. Thirteenth Cause of Action – Fraud     52

14. Fourteenth Cause of Action – Intentional Misrepresentation     53

15. Fifteenth Cause of Action –  Negligent Misrepresentation     55

16. Sixteenth Cause of Action – Fraud by Concealment     55

17. Seventeenth Cause of Action – Negligence     56

18. Eighteenth Cause of Action – Conversion     57

19. Nineteenth Cause of Action – Interference with Contract     58

20. Twentieth Cause of Action – Interference with Prospective Economic Advantage     59

VI.     **PRAYER FOR RELIEF**     60

VII.     **JURY TRIAL DEMANDED**     62

For its Complaint, Plaintiff **BIRIM GROUP, LLC** (hereinafter, "Birim" or "Plaintiff"), alleges as follows:

## I.
## INTRODUCTION AND SUMMARY OF ACTION

This racketeering case arises from a series of shocking acts of statutory violations, money laundering, wire fraud, breach of contract, negligence, outright fraud, deceit and related criminal acts perpetrated by defendant **Paa Kwesi Nduom,** his family members and the several sham companies they operate.

Plaintiff's assignors, like many similarly situated depositors of defendants Gold Coast Fund Management and GN Bank, are victims of defendants' fraudulent, avaricious and criminal conduct perpetrated on more than a million unsuspecting depositors who have lost their life savings because of defendants' unlawful acts.

Plaintiff alleges the Nduom Family defendants[1], aided and abetted by each of the other defendants, engaged in a course of racketeering conduct predicated on illegal monetary transactions, money laundering, wire and mail fraud. Defendants were motivated by nothing more than greed and self-aggrandizement. They used the stolen money to fund eponymous vanity projects such as a sports Stadium, a University, a Foundation and a Soccer Club.

Defendants' actions not only cost depositors their life savings and untold hardship; they have

---

[1]

The Nduom family defendants are Paa Kwesi Nduom, Yvonne Nduom, Nana Kweku Nduom, Edjah Nduom and Nana Aba Nduom. Given the number of defendants with that last name, plaintiff will refer to all the other Nduoms – except the aptly named paterfamilias Papa Kwesi Nduom – by their first names. Plaintiff means no disrespect by this familiarity in using first names. It is only for identification clarity and to avoid confusion.

contributed significantly to a serious on-going financial crisis in the Republic of Ghana.

The Nduom family defendants, by and through their ownership, control and use of defendants GN Bank, Gold Coast Fund Management and over 60 **undercapitalized** interrelated companies, collected several million dollars of depositors' savings, investment contributions and insurance premiums and, in violation of U.S. and Ghana laws, illegally laundered approximately **$63,000,000** (Sixty Three Million Dollars) of depositors' funds through its Virginia-based sham "procurement and consulting service" company, International Business Solutions, LLC (hereinafter, IBS).

Believing the U. S. to be a safe haven for the proceeds of their fraud, the criminal scheme involved, among other things, the transfer – through the instrumentality of the international money wire system – of inflated, over-invoiced and above-market rate fees disguised as payment for "management services" to defendant IBS. In fact, IBS is nothing but a shell company with an industrial zone store front office, no staff and a bare bones 4-page website created solely to facilitate the Nduom defendants' fraud.

Plaintiff is informed and believes and alleges that all or a significant portion of the converted and illegally laundered depositor funds, including those assigned to plaintiff, were used for the personal benefit of the defendants to acquire assets, including the Illinois Service Federal Bank, which, consistent with the Nduom family's self-aggrandizement, was promptly renamed Groupe Nduom Bank.

Sadly, the scale of defendants' fraudulent and criminal conduct will put Bernie Maddoff to shame. In fact, defendants' conduct, at once brazen, predatory, and wide-ranging in its effect on more than a million customers, is best described as Maddoff on steroids.

Plaintiff **BIRIM GROUP, LLC**, brings this action as the assignee for valuable consideration

of the rights, choses in action and claims of Mavis Amanpene Sekyere, an account holder and customer of defendant Gold Coast Fund Management (a.k.a. Blackshield Capital Management) and of Nana Kwame Twum Barimah, an account holder and customer of defendant GN Bank, Ghana. The more specific bases for Plaintiff's complaint for damages follows.

## II.
## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Section 1332. The parties' citizenship is completely diverse and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. Further, the Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1331; it has original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the U.S. and the matter involves violations of federal laws and statutes. Substantial acts in furtherance of the fraud, money laundering, wire and mail fraud or the effects of same have occurred in this Judicial District. Defendants Nduom family are the beneficial owners of defendant GN Bank of Chicago, Illinois.

Venue is proper under 28 U.S.C. Section 1391(b). Defendant GN Bank, its officers and directors, operate out of Chicago, IL and are subject to the court's personal jurisdiction in this action.

## III.
## PARTIES

A. **PLAINTIFF**

1.    Plaintiff, **BIRIM GROUP, LLC**, is a California Limited Liability Company, qualified to do business in the State of California and doing business in the County of Los Angeles. Plaintiff is engaged in the business of investing in securities, small business franchises, equity funding and related financial operations.

2.      Plaintiff is the assignee for valuable consideration of all right, title, ownership, and interest in and to the claims of Mavis Amanpene Sekyere, an account holder of defendant Gold Coast Fund Management, and Nana Kwame Twum Barimah, an account holder of defendant GN Bank, Ghana.

**B.      DEFENDANTS**

3.      Defendant **PAA KWESI NDUOM, a.k.a, Dr. PAA KWESI NDUOM, PAPA KWESI NDUOM, KWESI P. NDUOM**, (hereinafter, "Nduom") is, at all material times herein and continuing to the present, the Chairman and Chief Executive Officer of Groupe Nduom, a corporate entity whose website describes itself as a "Broad based multinational business group" and a "Multinational Family Holding Business of Ghanaian and American origin." Groupe Nduom is composed of over 60 interlocking subsidiary and sister companies across several industries.

4.      Plaintiff is informed and believes and thereon alleges Nduom is a citizen or permanent resident of the U.S. and a national of Ghana resident and or domiciled in both countries. Nduom owns and maintains residences in both Chicago, IL and Washington, D.C.

5.      Nduom is and, at all times relevant herein, was the Chairman of defendants Gold Coast Fund Management and GN Bank of Ghana.  He also plays a significant decision-making role in over 60 "independent companies" falling under the holding business entity, Groupe Nduom. Groupe Nduom includes, but is not limited to, the following undercapitalized business entities:

**GN Bank of Chicago (f.k.a. Illinois Service Federal Savings Bank); International Business Solutions, LLC, Endela Logistics, Groupe Nduom USA, LLC of Nevada, GN USA, LLC of Nevada, GN Money, LLC of Nevada, GN**

**Reinsurance; GN Life Assurance; Yorke Properties; GGFC; Gold Coast Brokerage; PenTrust; Qualitek; Coconut Grove Hotels; First Digital TV; SpyderLee Entertainment; Elmina Sharks Football Club; Today Newspaper; BTA; Digicut; GN Health; Nduom University; Monica Yorke School; Sterling Protection; GN Power; GN Logistics; GN Printing; GN Quarry; FreshPak;**

6.      Plaintiff is further informed and believes, and thereon alleges that Nduom serves on most, if not all, of the Boards of the aforementioned companies. He also holds various executive positions in most, if not all, of the above companies. He holds and controls through his family these interlocking subsidiary and sister companies.

7.      Defendant **GN BANK**, **Illinois**, (hereinafter, "GN-IL") formerly known as Illinois-Service Federal Savings and Loan Association, is a federally chartered institution, (Charter Number 703395) operating in and serving the South side of Chicago.

8.      According to the Office of the Comptroller of the Currency, GN-IL was acquired by defendant Groupe Nduom in April 2016, and as of June 2018 reported a total asset base of approximately $132,000,000 (One Hundred and Thirty Two Million Dollars). Plaintiff alleges GN-IL is wholly owned, dominated and controlled by Nduom and his family for the sole personal benefit of Nduom.

9.      Defendant **INTERNATIONAL BUSINESS SOLUTIONS, LLC**, (hereinafter, "IBS") is a limited liability company registered under the laws of Virginia, and qualified to do business in the Commonwealth of Virginia.

10.     According to its 4-page website, it is engaged in the business of "provid[ing] responsive, effective and quality procurement and consulting services to Groupe Nduom companies."

11.     It is listed on defendant Groupe Nduom's website as one of the various alleged "independent

companies" in the Groupe Nduom multinational family holding businesses. In fact, IBS is wholly owned, dominated and controlled by Nduom and his family for the sole personal financial benefit of Nduom.

12.   **GROUPE NDUOM USA LLC** (hereinafter, "Groupe Nduom Nevada") is a limited liability company registered under the laws of Nevada, and qualified to do business in the State of Nevada. Groupe Nduom Nevada is part of the multinational family businesses owned and controlled by the Nduom family for the sole personal financial benefit of the Nduom family and is used as a conduit to facilitate the unlawful acts described herein, including the diversion and theft of depositors' funds, money laundering and illegal wire transfers.

13.   **GN USA LLC** (hereinafter, "GN USA") is a limited liability company registered under the laws of Nevada, and qualified to do business in the State of Nevada. GN USA is part of the multinational family businesses owned and controlled by the Nduom family for the sole personal financial benefit of the Nduom family and is used as a conduit to facilitate the unlawful acts described herein, including the diversion and theft of depositors' funds, money laundering and illegal wire transfers.

14.   **GN Money, LLC** (hereinafter, "GN Money") is a limited liability company registered under the laws of Nevada, and qualified to do business in the State of Nevada. GN Money is part of the multinational family businesses owned and controlled by the Nduom family for the sole personal financial benefit of the Nduom family and is used as a conduit to facilitate the unlawful acts described herein, including the diversion and theft of depositors' funds, money laundering and illegal wire transfers.

15.   Defendant **GROUPE NDUOM**, (hereinafter "Groupe") is a Company registered under the

laws of the Republic of Ghana engaged in various business operations, including the management, direction and control of defendants GN-IL, Gold Coast Fund Management and GN Bank Ghana.

16.     Groupe Nduom is the umbrella "family holding business." It includes defendants GN-IL, Gold Coast Fund Management, GN Bank and more than 60 companies. Groupe does business throughout the U.S., Ghana and the world by operating some 60 subsidiary companies which it dominates and controls.

17.     Through this web of controlled companies, Groupe operates businesses to siphon and launder money from depositors in Ghana to accounts and businesses owned and operated by Nduom in the United States.

18.     Defendant **GN BANK, Ghana**, (hereinafter "GN-GH") which advertises itself as "The People's Bank", at all material times herein was a Ghana financial institution registered under the laws of the Republic of Ghana. It was engaged in banking and related financial services operations, including opening customer accounts, taking deposits, making loans, and financing projects. A substantial portion of its loans were illegally made to Nduom-related entities without the benefit of appropriate risk assessments, management or determinants.

19.     GN-GH is wholly owned, dominated and controlled by Nduom and his family for the sole personal benefit of Nduom. Having failed to meet its regulator's qualifying criteria, defendant GN-GH was initially downgraded and reclassified from a commercial banking house to a Savings and Loans company.

20.     On or about August 16, 2019, its license was formally revoked by its regulator, the central Bank of Ghana. Plaintiff is informed and believes GN-GH is currently in receivership.

21.     Defendant **GOLD COAST FUND MANAGEMENT, a.k.a. BLACKSHIELD CAPITAL MANAGEMENT** (hereinafter "Gold Coast") at all material times herein was and is an investment, wealth management and brokerage company registered under the laws of Ghana.

22.     Gold Coast is engaged in the solicitation of investment funds from the general public, maintaining customers' investment portfolios, providing investment advisory services and investing clients' funds in securities, government treasury notes, financial instruments, projects and commodities for the benefit of its clients, investors and for its own account.

23.     Gold Coast advertises itself as a provider of "Investment advice worth its weight in Gold". Gold Coast is wholly owned, dominated and controlled by Nduom and his family for the sole personal benefit of Nduom.

24.     Gold Coast's licence was revoked by Ghana's Security and Exchange Commission on November 8, 2019.  Plaintiff is informed and believes Gold Coast is currently in receivership.

25.     Defendant **YVONNE NDUOM** (hereinafter "Yvonne") is and at all material times herein and continuing to the present, was a board member of defendant Groupe Nduom and the wife of defendant Nduom.

26.     Yvonne is also either a member of the board and or an executive of one or more of the entities within the Groupe Nduom Family Holding businesses listed above, including defendants GN Bank, IL, Gold Coast Fund Management and GN Bank, Ghana.

27.     Plaintiff is informed and believes and thereon alleges Yvonne is either a citizen or a permanent resident of the U.S. and a national of Ghana resident and or domiciled in both countries.  Yvonne owns and maintains residences in both Chicago, IL and Washington D.C.

28.     Defendant **NANA KWEKU NDUOM**, (hereinafter, "Kweku") was and, at all material times

herein and continuing to the present, is a board member of defendant Groupe Nduom and the son of defendants Nduom and Yvonne. Kweku is also either a member of the board and or an executive of one or more of the entities within the Groupe Nduom Family Holding businesses listed above, including defendants Gold Coast Fund Management and GN Bank, Ghana.

29.     Groupe Nduom's website describes Kweku as a "Vice president of Business Development and Finance, [at Groupe Nduom] responsible for guiding GN member companies through the development and execution of their operational and financial goals."

30.     Kweku is the Chief Executive Officer of defendant IBS and doubles as its agent for service of process. Additionally, Endela Logistics, one of the several sham Nduom companies where Kweku acts as the Chief Financial Officer, describes Kweku as the founder of International Business Solutions, LLC, a company with which Endela shares an address on Vine Street in Alexandria, VA; and that as part of his work obligations and duties, Kweku has reviewed and approved "loans and investments totaling in excess of $100 million via Ghana Growth Fund Company and GN Bank."

31.     Plaintiff is informed and believes and thereon alleges that Kweku is either a citizen or a permanent resident of the U.S. and a national of Ghana resident and or domiciled in both countries.

32.     Defendant **EDJAH NDUOM,** (hereinafter, "Edjah") was and, at all material times herein and continuing to the present, is a board member of defendant Groupe Nduom and the son of defendants Nduom and Yvonne.

33.     Edjah is also either a member of the board and or an executive of one or more of the entities

within the Groupe Nduom Family Holding businesses listed above, including defendants Gold Coast Fund Management and GN Bank, Ghana.

34.    Plaintiff is informed and believes and thereon alleges that Edjah is either a citizen or a permanent resident of the U.S. and a national of Ghana resident and or domiciled in both countries.  Edjah owns and maintains a residence in Bethseda, Maryland.

35.    Defendant **NANA ABA NDUOM**, (hereinafter, "Nana")  was and, at all material times herein and continuing to the present, is a board member of defendant Groupe Nduom and the daughter of defendants Nduom and Yvonne.

36.    Nana is also either a member of the board and or an executive of one or more of the entities within the Groupe Nduom Family Holding businesses listed above, including defendant Gold Coast Fund Management and GN Bank, Ghana.

37.    Plaintiff is informed and believes and thereon alleges that Nana is either a citizen or a permanent resident of the U.S. and a national of Ghana resident and or domiciled in both countries.  Nana owns and maintains a residence in Redmond, Washington.

38.    Defendant **ROBERT KLAMP** (hereinafter "Klamp") was and, at all material times herein GN-IL's Chief Executive Officer, and has served in that capacity since 2016 and throughout the unlawful activities set forth herein.  Plaintiff is informed and believes and thereon alleges Klamp owns and maintains a residence in Itasca, IL and operates out of GN-IL's headquarters in Chicago.

39.    Plaintiff is informed and believes and thereon alleges that Klamp not only conspired with the other defendants in the commission of the unlawful activities which are the subject of this lawsuit, but deliberately turned a blind eye to the "know your customer" protocols mandated

by U.S. regulators of the banking industry and financial sector.

40.    Defendant **JAMES L. BUCKNER**, (hereinafter, "Buckner"), was and, at all material times herein and continuing to the present, is a director of defendant GN-IL, charged with directing GN-IL's general affairs, its corporate governance, executing its vision and mission, implementing its goals, while ensuring defendant GN-IL's financial success.

41.    Buckner's obligations and duties include being responsive to defendant GN-IL's shareholders, investors and owners. Plaintiff is informed and believes and thereon alleges Buckner is a resident of Chicago, Illinois.

42.    Defendant **LISA FINCH** (hereinafter, "Finch") was and, at all material times herein and continuing to the present, is a director of defendant GN-IL, charged with directing GN-IL's general affairs, its corporate governance, executing its vision and mission, implementing its goals, while ensuring defendant GN-IL's financial success.

43.    Finch's obligations and duties include being responsive to defendant GN-IL's shareholders, investors and owners. Plaintiff is informed and believes and thereon alleges Finch is either a resident of Chicago and or operated out of GN-IL's headquarters in Chicago.

44.    Defendant **FRANCIS BAFFUOR** (hereinafter, "Baffuor") was and, at all material times herein and continuing to the present, is a director of defendant GN-IL, charged with directing GN-IL's general affairs, its corporate governance, executing its vision and mission, implementing its goals, while ensuring defendant GN-IL's financial success.

45.    Baffuor's obligations and duties include being responsive to defendant GN-IL's shareholders, investors and owners. Plaintiff is informed and believes and thereon alleges Baffuor is a resident of U.S. and as a director, operates out of GN-IL's headquarters in Chicago.

46.     Defendant **WILLIAM GOODALL** (hereinafter, "Goodall") was and, at all material times herein and continuing to the present, is a director of defendant GN-IL, charged with directing GN-IL's general affairs, its corporate governance, executing its vision and mission, implementing its goals, while ensuring defendant GN-IL's financial success.

47.     Goodall's obligations and duties include being responsive to defendant GN-IL's shareholders, investors and owners.  Plaintiff is informed and believes and thereon alleges Goodall is either a resident of Chicago and or operates out of GN-IL's headquarters in Chicago.

48.     Defendant **DONALD DAVIDSON**, (hereinafter, "Davidson") was and, at all material times herein and continuing to the present, is a director of defendant GN-IL, charged with directing GN-IL's general affairs, its corporate governance, executing its vision and mission, implementing its goals, while ensuring defendant GN-IL's financial success.

49.     Davidson's obligations and duties include being responsive to defendant GN-IL's shareholders, investors and owners.  Plaintiff is informed and believes and thereon alleges Davidson is either a resident of Chicago and or operates out of GN-IL's headquarters in Chicago.

50.     Upon information and belief, all the individually named defendants have had regular, continuous and ongoing contacts with this jurisdiction through their actions on behalf of and business relationship with, the other defendants.

### C.     <u>DOE DEFENDANTS</u>

51.     The true names and capacities of the defendants sued herein as Does 1 through 100, inclusive, are presently not known to plaintiff, who therefore sues these defendants by such

---

fictitious names.

52.     Plaintiff will seek to amend this complaint to include these Doe defendants' true names and capacities when they are ascertained.

53.     Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein, and for the injuries suffered by the plaintiff and its assignors as a result of the defendants' illegal conduct.

   **D.     ALTER EGO; AGENCY; AIDING AND ABETTING AND CONSPIRACY ALLEGATIONS**

54.     Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the defendants was an agent, servant, licensee, employee, or alter ego of each of the remaining defendants, and was at all times herein mentioned, acting within the course and scope of said relationship.

55.     Plaintiff is informed and believes and thereon alleges that defendants IBS, Groupe Nduom, GN-IL, GN-GH, Gold Coast, Groupe Nduom USA, LLC, GN USA, LLC and GN Money, LLC (hereinafter, "Corporate Defendants") and the related 60 or more companies under the Groupe Nduom multinational family holding business are so organized, operated and controlled by the Nduom family defendants as to serve as a single business and or criminal racketeering enterprise, each entity serving as an instrumentality, agent and conduit of each other entity, with all of these entities serving and being operated by the Nduom Family defendants as a single business and or criminal and racketeering enterprise.

56.     The Corporate Defendants are owned and operated by the same owners and shareholders, Nduom and the Nduom family, and operate as a single business enterprise combining their assets and operations in the conduct of their international businesses and criminal and

racketeering activities.

57.   The Corporate Defendants have interlocking directors, officers and employees. They operate using the same shared pool of money, property, policies of insurance, assets, facilities, suppliers and employees as well as sharing the same customers and business opportunities.

58.   The Corporate Defendants were not only influenced and governed by the Nduom family defendants, but there is such a unity of interest and ownership that the individuality or separateness of the corporate defendants ceased, and the facts are such that an adherence to the fiction of the separate existence of these entities would, under the particular circumstances, sanction a fraud or promote injustice.

59.   Plaintiff is further informed and believes and thereon alleges that the Nduom family defendants dominate and control the Corporate Defendants and the related 60 or more companies, and in so doing, these entities commingle their funds and other assets and fail to segregate the funds of the separate entities. There is also the unauthorized diversion of corporate funds or assets to non-corporate uses.

60.   Further, the Corporate Defendants and the related 60 or more companies each treats the assets of the other as their own, and the Nduom family defendants treat the assets of each of the entity defendants as their own.

61.   Plaintiff is informed and believes and thereon alleges that the entities operated by means of loans and debts, and what they euphemistically called "creative financing", inflated billings and phony invoicing, cross-transfers of funds, overdrafts and the laundering, siphoning and use of depositor funds.

62.   The Corporate Defendants failed to maintain minutes or adequate corporate records, invoices,

receipts, purchase orders, customs entry forms, shipping documents, bills of lading, airway bills and sales receipts, thereby creating an intertwined and inter-twisted confusion of the records of the separate entities and in some instances, making up records as and when needed to facilitate or cover up their fraudulent acts.

63.     Plaintiff is further informed and believes, and thereon alleges that the Corporate Defendants and the related 60 or more companies share the identical equitable and or beneficial ownership, and share directors and officers, management and supervisors.

64.     Plaintiff is informed and believes that there was also a failure to adequately capitalize not only the Corporate Defendants herein, but the 60 or more related entities; and that there is a lack of business assets, and that the deliberate undercapitalization of each of the entity defendants makes them functionally sham, store front, shell and straw companies.

65.     Consequently and not surprisingly, defendants GN-GH and Gold Coast have been unable to meet withdrawal demands of their depositors in more than a year.

66.     Plaintiff is informed and believes and thereon alleges the Corporate Defendants and the related 60 or more companies use the other business entities to procure labor, services or merchandise for other persons or entities; there is the diversion of assets from one business entity to the Nduom defendants and their other entities to the detriment of creditors, and depositors.

67.     The Corporate Defendants manipulate the assets and liabilities between the entities so as to concentrate the assets in one and the liabilities in others; and these entities further engage in the practice of contracting with one and other with the sole intent to create fictional transactions, generate fraudulent bills and invoices and dubious make-work transaction fees.

68.     The Corporate Defendants and the Nduom family defendants avoid cost-effective performance by the use of business and corporate formalities as a subterfuge for illegal transactions designed to siphon off depositors' monies and convert them to the use of the Nduom family.

69.     The business model and strategy of the Nduom family and the Corporate Defendants is to "socialize their losses and personalize their profits" – to leave the public and their depositors, including Plaintiff's assignors, holding the bag with losses in bad times, and to personally pocket the pelf in good times.

70.     Plaintiff is further informed and believes and thereon alleges that each of the Corporate Defendants was used as a mere shell, instrumentality or conduit for the single criminal and racketeering venture or the business of the Nduom family defendants and the other business entities, and for the concealment of the personal financial activities, business activities and payment of living expenses of Nduom family defendants.

71.     The failure to maintain arm's length relationships among the Nduom and Corporate Defendants and their related companies, was with the intent to conceal and defraud defendants' creditors and depositors such as Plaintiff's assignors.[2]

72.     Plaintiff is further informed and believes, and thereon alleges that at all times herein each defendant, individually or through its officers, directors and employees, servants, agents,

---

[2]

It is noteworthy the transactions for which defendants paid IBS several million dollars in inflated procurement and make-work "management service fees" could have been easily performed by a receptionist sitting in GN's head quarters in Asylum Down, Accra, logging onto an Amazon account and ordering the supplies for the Groupe Nduom enterprises. There was no legitimate cost-effective business reason other than deliberate, premeditated fraud to engage IBS to do it from far-flung Virginia at an unreasonably high cost.

principals, managers, supervisors and colleagues, had on-going knowledge of the wrongful conduct of said agents, servants, licensees, employees and alter egos, and allowed this wrongful conduct to occur and continue, thereby ratifying said wrongful conduct, with a conscious disregard of the rights, interests, claims and benefits of depositors such as Plaintiff's assignors; and after becoming aware of their wrongful conduct, each defendant authorized and ratified the wrongful conduct herein alleged.

73.     Plaintiff is informed and believes that at all relevant times herein, the acts of the Corporate Defendants herein were performed by an officer, director, servant and or representative of Groupe Nduom and its related companies, and at the direction and instruction of the Nduom family defendants herein.

74.     Plaintiff assignors did not discover defendants' racketeering and fraudulent activities until 2019, when the Bank of Ghana and the Ghana Securities and Exchange Commission revoked the licenses of defendants GN-GH and Gold Coast.

## IV.
## FACTS COMMON TO ALL CAUSES OF ACTION

75.     The criminal and racketeering activities of the Nduom family and its corporate defendants are at once engaging in their elegant simplicity and maleficence.  Here's what they did: The Nduom family defendants set up a bank in Ghana, a country with a notoriously weak regulatory environment, collected, aggregated and converted the hard earned income of local working-class depositors and, in violation of U.S. and Ghana laws, laundered it through sham and undercapitalized companies they controlled, and recycled the laundered funds in the U.S. to acquire "legitimate" assets, including the Illinois Service Federal Bank.  Unfortunately and sadly, defendants' racketeering crime only unraveled after it had caused untold hardship and

much damage to more than a million people, including plaintiff's assignors, whose savings they stole.

76.   The pattern of racketeering and money laundering scheme operated as follows: In March, 2013, the Nduom defendants and defendant GN-GH, (under its former name, First National Savings and Loans Ltd.) signed a "Management and Operations Agreement" with defendant IBS, an undercapitalized sham company wholly owned and controlled by defendant Groupe Nduom and run by defendant Kweku Nduom, the son of defendants Paa Kwesi and Yvonne Nduom.

77.   Commencing from about 2015 and continuing thereafter, whenever the Nduom family defendants wanted to steal and launder depositors' funds into the U.S., their controlled financial institutions, defendants GN-Bank and Gold Coast would aggregate customer funds on deposit and exchange the funds into convertible currency in violation of domestic currency transaction restrictions, laws and regulations. Defendants would then generate a make-work order to its Virginia-based wholly controlled entity, defendant IBS that it procure supplies for one of its sham undercapitalized companies. IBS would then "procure" the supplies requested and generate a spurious over-invoiced bill, send it through interstate commerce by wire, in violation of U.S. wire and mail fraud statutes.

78.   On receipt, defendants GN-GH and Gold Coast would wire the stolen depositor funds to IBS as and for its "management and procurement services fees". For example, IBS would routinely be paid of $1,000,000, for "procuring" $50,000 worth of computers, $950,000 of which wired funds would go to IBS as its "management fees".

79.   The exchange of depositor funds into convertible currency was in violation of Ghana's

currency transaction and banking laws and the wire transfers were in violation of both Ghana banking laws and U.S. criminal statutes.

80.     As a consequence of these racketeering offenses, defendants GN-GH and Gold Coast depleted all their customer deposits and have been unable to satisfy withdrawal demands by plaintiff's assignors since late 2018 and continuing to the present.

81.     The total of these racketeering transfers amounted to **$63,000,000** (Sixty Three Million Dollars) most of which have been used by the Nduom family and defendants to acquire U.S. assets, including defendant bank GN-IL, in violation of U.S. anti-money laundering criminal statutes.  (Attached hereto, marked Exhibit A and made a part hereof is a true and correct copy of a partial list of the money wire transfers defendants executed for the benefit of IBS.)

A)      **Facts Relating To Regulatory Actions**

        I. **Bank of Ghana Revokes Defendant GN-GH's License**

82.     Defendants' criminal and fraudulent scheme unraveled when on August 16, 2019, the Central Bank of Ghana (BOG) revoked defendant GN-GH's banking license.[3]  In its revocation notice, the BOG's list of defendant GN-GH's violations included, but were not limited to the fact that GN-GH's capital adequacy ratio had fallen below the minimum required by the BOG, to -61% (negative 61%).

83.     In addition, GN-GH had consistently failed to meet the minimum cash reserve requirement of ten percent (10%) of its total deposits since the end of the first quarter of 2019.

_____

[3]

A true and correct copy of the BOG's notice of revocation may be accessed at https://www.bog.gov.gh/wp-content/uploads/2019/08/Revocation-of-Licenses-of-SDIs-16.8.19.pdf   The specific information relating to the revocation of defendant GN-GH's license is found on pages 18 through 20, inclusive (bullet point #5, page 19).

84.     Further, the BOG found defendant GN-GH's self-dealing with two of the Nduom network

of businesses, defendant Gold Coast and Ghana Growth Fund – an entity which, under Ghana

Security and Exchange Commission's regulations, was operating illegally – had resulted in

a loss of $158,000,000 (One hundred and Fifty Eight Million dollars).[4]  The losses were

depositor funds, including those belonging to plaintiff's assignors.

85.     The $158,000,000 had been expended in the form of overdraft transfers to the two Nduom

companies, in violation of Section 64(2) of Act 930, the statute which governs and regulates

defendant GN-GH's banking activities.

86.     The BOG also found that defendant GN-GH's net worth was **negative** -$6,000,000 (Minus

Six Million Dollars), in violation of Section 28(1) of Act 930.

87.     The  BOG  concluded  that  GN-GH's  liquidity  and  "insolvency  problems  are  largely

attributable to the overdraft and other facilities it extended to its related parties who are other

[sham] companies in the Nduom network of businesses."

88.     The BOG found the "failure of the two related parties to pay back these funds to [defendant]

GN affected GN's capital position, leading eventually to its insolvency and acute liquidity

challenges" and that the "structure of [defendant] GN-GH's balance sheet clearly shows **the**

**bank mobilizes deposits for its related companies**" [Emphasis added]. And, as alleged

herein, not only were depositor funds mobilized for GN-GH's related companies, they were

mobilized with the specific intent to be stolen, laundered and siphoned off to what defendants

---

[4]

Although the amounts in the revocation notices are quoted in local currency, Ghana
Cedis (GH¢), for the benefit of the court plaintiff converts them into U.S. dollars
at an average exchange rate of $1= GH¢5.

perceived as a safe haven for their personal benefit and use.

89.     The BOG's investigation revealed that defendants and each of them were engaged in a classic fraudulent Ponzi scheme: collecting funds from the unsuspecting public under the guise of banking and investing, funneling to and shuffling those funds from one entity to pay off liabilities of another without any appropriate, accounting, legal and or legitimate financial justification.

**II. Ghana's SEC Revokes Defendant Gold Coast's Brokerage License**

90.     Similarly, defendant Gold Coast's con fell apart when, on November 8, 2019, the Ghana SEC (hereinafter, "GSEC") revoked Gold Coast's license (renamed Blackshield Capital Management at the time of the revocation). In its revocation notice, the GSEC charged Gold Coast with several violations, including but not limited to:

> *"a) Failure to honour [sic] clients' redemption requests;*
>
> *b) Placement of client funds with related [Nduom defendants] parties without proper due diligence and the requisite standard of professional conduct contrary to Paragraphs, 2, 3, 6 and 13 of Part X of the Commission's Compliance Manual for Broker-Dealers, Investment Advisers and Representatives 2008. According to Blackshield's 2nd Quarter 2018 Placement Report, 99.41% of Blackshield's funds under management had been placed with an unregulated related entity, Ghana Growth Fund Limited (now Gold Coast Advisors Limited);*
>
> *c) Failure to adhere to voluntary payment plans agreed on at Complaints hearings contrary to required professional and ethical conduct in paragraph 2, 3 and 6 of Part X of the SEC Compliance Manual for Broker-Dealers, Investment Advisers and Representatives 2008 and general best international industry practice;*

*d) Non-submission of statutory reports contrary to Regulation 33(1)(a)(b)(c) and (6) of L.I.1728;*

*e) Failure to pay penalties levied by the Commission; and*

*f) Advertising of an unapproved investment product, Cardinal Master Trust in contravention of Securities Industry Act, 2016 (Act 929) and Securities and Exchange Commission Regulations, 2003 (LI 1728)".* [5]

91.    Plaintiff is informed and believes and thereon alleges that the defendants' violations of the foregoing statutes, regulations, and rules, specifically enacted to protect the public from the very conduct defendants and each of them engaged in, constitute negligence *per se,* proximately causing plaintiff and its assignors the injuries and damages alleged here.

B )    **Facts Relating to Assignor Mavis Amanpene Sekyere**

92.    On November 23, 2017, assignor Mavis Amanpene Sekyere opened an account with defendant Gold Coast Fund Management at its Sakumono, Ghana branch and deposited GHC100,000.  Following the initial deposit and within 30 days, assignor made a second deposit in the amount of GHC100,000 and soon thereafter, another GHC100,000, for a total deposit of GHC300,000

93.    The agreement between assignor and defendant Gold Coast was that her funds would be prudently and conservatively managed, invested in securities, government bonds and other

---

[5]

A true and correct copy of the SEC's notice of revocation may be accessed at: https://sec.gov.gh/wp-content/uploads/Public-Notices/public_notice_of_revocation_of_licences_of_fund_management_companies_and_notification_to_the_registrar_of_companies.pdf The specific information relating to defendant Gold Coast is on page 18, #4, under "Blackshield Capital Management Ltd (Formerly Gold Coast Fund Management Limited)".

low risk equities, with its earnings, income, gains and returns paid to her quarterly. Defendants promised assignor that by the end of the investment term, she would receive an amount of $80,000 (Eighty Thousand U.S. Dollars), exclusive of interest. . The assigned current balance on the account is equivalent to $100,000.

94. Contrary to the investment agreement, defendant Gold Coast failed to so invest assignor's funds. Rather, Gold Coast fraudulently commingled assignor's funds with other depositors' funds and in violation of Ghana and U.S. laws, converted the funds and exchanged them for dollars, euros and pounds. Further, through the use of the wire transfer system, aided and abetted by defendants IBS and each of them, defendants transferred those funds to IBS as payment for spurious and fraudulent unearned "management service fees" over the course of several months, as alleged herein.

95. Sometime in 2018, defendants breached the investment agreement. Without any notice, negotiation, or discussions with assignor, defendants unilaterally "restructured" and modified the investment agreement. Defendants informed assignor her accrued gains would not be paid on a quarterly basis as originally agreed, but rather "re-invested" along with her principal. Defendants further informed assignor they had instituted a new payment plan which called for a three year pay out period commencing from 2019, rather than the initially agreed quarterly payments. Defendants have yet to pay a cent to assignor.

96. On receiving Gold Coast's letter, assignor informed defendants they had breached the terms of the investment agreement. Assignor demanded a prompt return of her principal, plus any and all accrued interest, earnings, and gains. Defendant Gold Coast did not respond to assignor's demand and has failed and or refused to return assignor's funds notwithstanding

the demand.  In July 2019, assignor served Gold Coast a written demand for the return of her investment.  To date, defendants have refused, and continue to refuse to return assignor's appropriated life savings.

97. On December 27, 2019, for valuable consideration, assignor assigned all right, title, ownership, and interest in and to all of her claims, rights, obligations, choses in action and duties under the terms of the investment agreement to assignee, Birim Group, LLC which brings this action as assignee.

C) **Facts Relating to Assignor Nana Kwame Twum Barimah**

98. In or around December, 2016, assignor Nana Kwame Twum Barimah, opened an account with defendant GN-GH at its Akim Oda, Ghana branch.  As part of the account set-up process, assignor agreed with GN-GH, "the People's Bank" that his monthly salary would be deposited in his account and paid to him on demand through check writing, direct bank teller or ATM withdrawals.

99. Unbeknownst to assignor, in breach of the terms of the agreement and in violation of Ghana and U.S. laws, defendants fraudulently combined, aggregated and commingled assignor's account funds with those of other depositors, converted the funds and exchanged them into convertible foreign currency.  The running minimum balance on assignor's account at the time his salary was deposited into defendant GN's branch was approximately $30,000.

100. Through the international wire transfer system, aided and abetted by defendants IBS, its CEO Kweku Nduom and each of them, defendants transferred the funds to IBS as payment for spurious and fraudulent unearned "management service fees" over the course of several months.   Defendants then used the laundered funds to acquire properties, including

defendant bank GN Bank of Chicago, IL.

101.    Since July, 2019, assignor has appeared on several occasions at defendant GN-GH's branches and requested funds from his accounts. Defendants GN-GH and each of them refused and continue to refuse to honor assignor's request in breach of the terms of the deposit agreement.

102.    On or about December 21, 2019 assignor, for valuable consideration, assigned all of hisl right, title, ownership, and interest in and to all of his claims, rights, obligations, choses in action and duties under the terms of the deposit agreement to assignee, Birim Group, LLC which brings this action in its capacity as assignee.

103.    Plaintiff, Birim Group as assignee stepping in the shoes of its assignors, brings this action against defendants named herein.

## V.
## CAUSES OF ACTION

### First Cause of Action
### (Federal Civil RICO, 18 U.S.C.§1962)
### (Against All Defendants)

104.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

105.    "Racketeering activity" means any act which is indictable under any of the following provisions of title 18, United States Code: Section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), Section 1956 (relating to the laundering of monetary instruments) and Section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

106. Defendants and each of them violated the RICO Act and plaintiff was injured as a result.

107. Each defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. Section 1961(3)

108. Each defendant conspired, in violation of Section 1962(d) to violate the provisions of subsections (a) (b) and (c) of Section 1962 by the acts describe in the prior paragraphs and as further described below.

### The Enterprise

109. The Corporate Defendants, GN-IL, Gold Coast, GN-GH, IBS, Groupe Nduom, Groupe Nduom USA, LLC, GN USA, LLC and GN Money, LLC together with the Nduom family defendants and the individually named directors and officers of GN-IL formed an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. section 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.

110. Alternatively, the Nduom Family defendants constitute a separate enterprise within the meaning of 18 U.S.C. Section 196 (4).

111. Alternatively, the Corporate Defendants constitute a separate enterprise within the meaning of 18 U.S.C. Section 1961(4).

112. Alternatively, the officers and directors of the Corporate Defendants constitute a separate enterprise within the meaning of 18 U.S.C. Section 1961(4).

113. Each enterprise has engaged in, and their activities have affected, foreign commerce.

**Pattern of Racketeering Activity**

114.    Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, wilfully and unlawfully conduct or participate directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. Section 1961(1), 1961(5) and 1962(c). The racketeering activity was made possible by defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

115.    Predicate acts of racketeering activity are acts which are indictable under the provisions of the U.S. Code enumerated in 18 U.S.C. Sections 1961(1)(B) as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted in the commission of such acts.

116.    The acts of racketeering were not isolated, but rather the acts of defendants and each of them were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by defendants have been continuous. There was repeated conduct during a period of time beginning in approximately 2013 and continuing to the present, and there is a continued threat of repetition of such conduct.

117.    The association-in-fact enterprise and the alterative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of providing banking and investment services to plaintiff assignor and to

hundreds of thousands of other customers.

118.   Plaintiff specifically alleges that defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

**Predicate Act: Money Laundering In Violation of 18 U.S.C. Section 1956**

119.   Defendants committed acts constituting indictable offenses under 18 U.S.C. Section 1956 which provides that whoever knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity shall be guilty of a crime.

120.   Subsection (c)(4) defines the term **"financial transaction"** as:  (A) a transaction which in any way or degree affects interstate or foreign commerce (I) involving the **movement of funds by wire** or other means.

121.   Section 1956 (c)(3) defines "**transaction**" to include the transfer, delivery or other disposition, and which, with respect to a **financial institution**, includes transfers between accounts, **exchange of currency**, or any other payment, **transfer or delivery by, through or to a financial institution** by whatever means effected.

122.   Section 1956(c)(9) defines "**proceeds**" as any property derived from or obtained or retained, directly or indirectly, **through some form of unlawful activity**, including the gross receipts

of such activity.

123.    Section 1956(c)(7) defines "specified unlawful activity", under its subsection and subparagraph B(iii) to include **fraud, or any scheme or attempt to defraud, by or against a foreign bank.** And, as it relates to a financial transaction, if it occurred in whole or in part in the United States, any offense against a foreign nation involving fraud or any scheme to defraud the bank.

124.    Subsection (b)(2)(c) further provides that for the purposes of adjudicating an action filed under this section, the court shall have jurisdiction over any **foreign person**, **including a financial institution authorized under the laws of a foreign country**, against whom an action is brought . . . and the foreign person is a financial institution that maintains a bank account at a financial institution in the United States. [Emphases added].

125.    At all relevant times herein, the Corporate Defendants, with the exception of IBS were and are financial institutions coming under section 1956.   Defendant GN-IL is located in Chicago and is currently engaged in the business of banking.  Gold Coast and GN-GH are located in and operated from Ghana, and up until their licenses were revoked after the acts alleged herein, were actively engaged in banking and related financial transactions.

126.    On or about August 16, 2019, the Bank of Ghana revoked the operating license of defendant GN-GH, and on or about November 8, 2019, the Ghana Securities and Exchange Commission revoked the license of defendant Gold Coast.

127.    The transactions which are the subject of this action were executed before defendants GN-GH and Gold Coast's licenses were revoked.  In its revocation notice, the central Bank of

Ghana charged defendant GN-GH **unlawfully** transferred to defendant IBS, the Nduom shell company, the sum of **$62,255,516** (Sixty Two Million Two Hundred and Fifty Five, Five Hundred and Sixteen Dollars), **£718,528** (Seven Hundred Eighteen Thousand Five Hundred and Twenty Eight pounds), and **€4,200** (Forty Two Hundred Euros), in violation of the central Bank's rules and regulations.

128.    Specifically, the transactions were violative of Section 19 of the Foreign Exchange Act 2006, Act 723, Section IV of the Bank's Notice No. BD/GOV/SEC/2007/4.  The central Bank of Ghana also charged defendants' transfers were unlawful because there were no supporting documents for all the transfers made to defendant IBS.

129.    Plaintiff is informed by both the unambiguous meaning of section 1956 and the facts contained in the Bank of Ghana's revocation notices, and thereon alleges the exchange of currency and the unlawful transfers of the exchanged proceeds directly constitute defendants' engagement in "specified unlawful activit[ies]", within the meaning of the anti-money laundering section 1956.  The transactions were schemes not only to defraud assignors and a million or so depositors, but to defraud a foreign bank.

130.    Plaintiff further alleges that the transactions and transfers which were fraudulently designated as "management service fees" owed to IBS, were made, designed and executed in whole or in part in the U.S., with the sole purpose of concealing, and disguising the true nature, the location, the source, the ownership, or the control of the proceeds of defendants' specified unlawful activities.  The funds were depositor funds, converted and transferred without the authorization of the central Bank of Ghana and in violation of 18 U.S.C. section

1956.

131. Plaintiff alleges the truth is the transferred funds belonged to plaintiff's assignors and millions of other depositors. Defendant IBS was not entitled to receive those funds because the sham company had not performed any legitimate, significant valuable service, or delivered any professional services to the defendants warranting the inflated, unreasonable, fraudulent and unearned so-called "management service fees" defendants paid to IBS.

132. Further, the fact defendants failed to maintain records, including, but not limited to, invoices, receipts, purchase orders, customs entry forms, shipping documents, bills of lading, airway bills and sales receipts, and failed to inform the central Bank of Ghana of the transactions, but actively sought to evade and evaded foreign exchange transfer controls, regulations and restrictions, is cogent and compelling evidence of scienter.

133. On or about October 18, 2018, defendant Nduom made deliberate and knowingly material false public statements and misrepresentations in an effort to cover up his fraud. Nduom stated "there is no relationship between GN Bank, Ghana and GN Bank Chicago, USA, and any of the GN conglomerates spread across the globe." And that "we cannot transfer any money from Ghana to any of our companies in America neither can we transfer money from our companies in America to any of our companies in Africa. We cannot also deposit monies in any of our businesses in America from Africa".[6]

---

[6]

See,
https://www.ghanaweb.com/GhanaHomePage/NewsArchive/Nduom-clears-air-on-GN-Bank-Chicago-693721

---

134.    The statements were knowingly false in that defendant Nduom had fraudulently transferred several millions of dollars to IBS, a company which he knew to be one of his companies, located in Virginia and which is described on Groupe Nduom's website as part of the Nduom group of companies, as alleged above.

135.    Furthermore, Nduom's statement "we cannot also deposit monies in any of our businesses in America from Africa" was knowingly false in that defendant Nduom knew he had fraudulently deposited monies in defendants GN-IL and IBS from his Africa-based companies.

136.    The deliberate and knowingly false statements further constitute cogent and compelling evidence of scienter.

137.    Plaintiff is informed and believes and thereon alleges the $63,000,000 defendants transferred to the U.S., beyond the regulatory reach of the Bank of Ghana and defrauded depositors, were part of the proceeds defendants used to acquire, invest and maintain defendant GN-IL, a federally charted U.S. bank operating on the South side of Chicago, IL.  Defendants also used some of the illegally wired and laundered funds to acquire other assets and properties in the U.S.  Defendants' transfer of the funds is not only a brazen violation of U.S. criminal statutes, it is against its stated public policy not to have laundered funds injected into the stream of U.S. commerce.

138.    Plaintiff is informed and believes, and thereon alleges that at all material times hereto, the bank defendants and each of them, maintained bank accounts at financial institutions within the U.S., and as such are subject to the jurisdiction of this court, pursuant to subsection and subparagraphs (b)(2)(c) of Section 1956.

139.    The acts of defendants set forth above were done wilfully and with knowledge that the money was stolen, converted or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance defendants' scheme or artifice.

**Predicate Act: Use of Wires and Mails to Defraud Plaintiff in Violation of U.S.C. Sections 1341 and 1343.**

140.    Defendants committed acts constituting indictable offenses under 18 U.S.C. Sections 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud plaintiff or to obtain money from plaintiff's assignors by means of false or fraudulent pretenses, representations or promises.

141.    For the purpose of executing their scheme or artifice, defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers, or received such therefrom. Defendants transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce various writings, emails, signs and signals. The acts of defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance defendants' scheme or artifice.

142.    Defendants carried out their scheme in different states and countries and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires.

143.    In furtherance of their scheme alleged herein, the Corporate Defendants, Nduom Family Defendants and the officers and directors of the companies communicated among

themselves and with plaintiff's assignors in furtherance of the scheme to defraud plaintiff's assignors. These communications were typically transmitted by wire, (i.e., electronically) and or through the U.S. mails or private or commercial carriers. Defendants also transmitted or caused the invoices, billings from IBS and payments to IBS, including related banking documents to be transmitted by mail or wire, commencing from 2013 and continuing to today.

144. Plaintiff's assignors reasonably and justifiably relied upon defendants' false representations, false pretenses and deceptive communications, and plaintiff has been damaged as a direct and proximate result of defendants' participation in such enterprise, as alleged herein.

145. Title 18, section 1343 provides that whoever having devised or intending to devise any **scheme or artifice to defraud**, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmits or causes to be transmitted by means of wire . . . in interstate or **foreign commerce**, any **writings**, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall be guilty of a crime.

146. The section further provides that if the violation occurs or affects a **financial institution**, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years or both. [Emphases added].

147. As alleged herein, defendants made false promises and representations relating to assignors' deposited funds, including but not limited to, defendant Gold Coast's promise of a 90-day return on investments and defendant GN-GH's promises of retaining and maintaining funds in segregated accounts and its false promise depositors would have ready access to their deposits.

148.  Plaintiff alleges defendants Gold Coast, GN-GH and GN-IL were financial institutions at all times herein alleged, and that defendants unlawfully and fraudulently exchanged currency and transferred depositors' funds in foreign commerce without complying with local banking regulations, as charged in the Bank of Ghana's licence revocation notice.  Plaintiff further alleges these acts constituted a scheme for obtaining money by false pretenses under section 1343.

149.  Plaintiff further alleges that the unlawful and fraudulent designation of the wired funds as "management service fees" payable to defendant's sham company IBS, constituted a **"writing"**, within the meaning of the statute, and as such constituted fraud by means of wire.

150.  The writing falsely and unlawfully designated the funds as payment for "management services" when in fact they were not.  Rather, they were proceeds of fraud and specified unlawful activity.  Defendants transmitted millions of dollars in funds by wire to the U.S., a portion of which defendants used for their own benefit and to acquire a federally chartered bank in Chicago as well as other assets and properties.

151.  Plaintiff believes and thereon alleges that the written designation appeared on the wire transfer transaction documents, and that the documents were received by the U.S. corresponding bank to which the funds were transferred, and from which they were credited to defendant IBS' account.

**Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. Sections 2314 and 2315.**

152.  Defendants committed acts constituting indictable offenses under 18 U.S.C. section 2314 in that having devised or intended to devise a scheme or artifice to defraud plaintiff's

assignors or to obtain money from them by means of false or fraudulent pretenses, representations or promises, defendants transported or caused to be transported in interstate or foreign commerce money having a value of $5,000 or more, which was stolen, converted and taken by fraud.

153.    Defendants also committed acts constituting indictable offenses under 18 U.S.C. section 2315, in that they received money in excess of $5,000, which crossed a State or U.S. boundary after being stolen, unlawfully converted or taken.  The acts of defendants set forth above were done wilfully and with knowledge that the money was stolen, converted or taken by fraud.  These acts were done intentionally and knowingly with the specific intent to advance defendants' scheme or artifice.

**Predicate Act: Travel in Furtherance of Scheme to Defraud in Violation of U.S.C. Section 1952.**

154.    Defendants committed acts constituting indictable offenses under 18 U.S.C. section 1952, in that having devised or intended to devise a scheme or artifice to defraud plaintiff's assignors or to obtain money from them by means of false or fraudulent pretenses, representations or promises, defendants then traveled in foreign commerce and used facilities in foreign commerce in order to promote, manage and facilitate the continuation of their scheme.  Among other things, upon information and belief, in March or April 2016, May 2018 and July 2018,  defendant Nduom, on behalf of himself and the other defendants, traveled to the U.S. with the intent to promote, manage and facilitate defendants' scheme to defraud plaintiffs by conducting meetings, conferences, and related discussions with the officers and directors of defendant GN-IL.

155.    In or around July 2018, defendant Nduom traveled to Chicago for the purpose, among

others, of "re-branding" and renaming his newly acquired bank, the Illinois Service Federal

Bank to GN Bank. While in Chicago, Nduom, on behalf of himself and the other

defendants, did in fact promote, manage and facilitate the continuation of defendants'

scheme to defraud plaintiff and its assignors.

156.    These acts were done intentionally and knowingly with the specific intent to advance

defendants' scheme or artifice.

157.    Defendants' shared objective was and is to divert stolen funds to their own benefit and to

facilitate the acquisition of properties with said funds.

158.    Plaintiff has been damaged as a direct and proximate result of defendants' travels and

transactions in foreign commerce for purposes of promoting, managing and facilitating the

continuation of their scheme.

**Continuity of Conduct**

159.    Defendants' violations of state and federal laws as set forth herein, each of which directly

and proximately injured plaintiff and other depositors, constituted a continuous course of

conduct spanning a period from approximately 2013 to present which was intended to obtain

money through false representations, fraud, deceit and other improper and unlawful means.

Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C.

section 1961(1)(5).

160.    Upon information and belief, defendants have conducted and or participated, directly or

indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of

racketeering activity as defined in violation of 18 U.S.C. section 1962(c).

161.    The unlawful actions of defendants, and each of them, have directly, illegally, and

proximately caused and continue to cause injuries to plaintiff and its assignors. Plaintiff seeks an award of damages in compensation for, among other things, the thousands of dollars plaintiff stole from plaintiff and is assignors.

162. Plaintiff accordingly seeks an award of three times the damages sustained, and the recovery of reasonable attorneys fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

<u>Second Cause of Action</u>
**(Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d))**
**(Against All Defendants)**

163. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth herein.

164. In violation of 18 U.S.C. section 1962(d), the defendants and each of them, knowingly, wilfully and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged above.

165. The conspiracy commenced at least as early as 2013 and is ongoing and it was to and continues to violate 18 U.S.C. section 1962, as alleged above.

166. The conspiracy's purpose was to divert money from plaintiff's assignor and other depositors to defendants' own benefit and to launder said money to facilitate the acquisition of properties and foreign assets.

167. Each defendant committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy included misleading plaintiff's assignors as to the true purpose of the investments and deposits they made into defendants' financial institutions,

aggregating depositor funds, converting said funds, exchanging said funds into dollars, euros and pounds and wiring same to IBS disguised as fraudulent payment for fictitious or over-invoiced "management service fees", participating in negotiations for a proposed sale and acquisition of defendant GN-IL, using plaintiff's assignors money, and that of other depositors, traveling in foreign commerce to facilitate and manage the scheme to defraud plaintiff's assignors as described above.

168.   Even if some of the defendants did not agree to harm plaintiff and its assignors specifically, the purpose of the acts they engaged in was to advance the overall objective of the conspiracy, and harm to plaintiff and its assignors was a reasonably foreseeable consequence of defendants' actions.

169.   Plaintiff has been injured and continues to be injured in its finances and property by defendants' conspiracy in violation of U.S.C. Section 1962(d). The unlawful actions of defendants and each of them, have directly, illegally and proximately caused and continue to cause injuries to plaintiff and its assignors.

170.   Plaintiff seeks an award of damages in compensation for, among other things, the thousands of dollars that defendants stole from plaintiff and its assignors. Plaintiff further seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief authorized by statute.

## CAUSES OF ACTION ARISING FROM DEFENDANTS' UNLAWFUL ACTS AGAINST AMANPENE SEKYERE

### Third Cause of Action
### (Breach of Contract Against Defendant Gold Coast Fund Management)

171.   Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though

fully set forth here.

172. At all times material hereto, plaintiff's assignor Amanpene Sekyere, entered into a written and oral agreement with defendant Gold Coast whereby assignor deposited her life savings in the approximate amount of $80,000 into a segregated account as part of Gold Coast's investor funds management portfolio. It was further agreed between assignor and Gold Coast that defendants would invest the funds prudently and conservatively in secure government and other low-risk investment instruments; and that any and all income, interest, accruals, profits and gains would be paid to her each quarter. (Attached hereto, marked Exhibit B and made a part hereof is a true and correct copy (with personal information redacted) of the written agreement between Sekyere and Gold Coast).

173. Contrary to the agreement, assignor's funds were commingled with other depositors' funds and converted by defendants Gold Coast and each of them, to their own use and benefit. Defendants, in violation of the banking laws of Ghana, specifically Act 930, (Banks and Specialised Deposit-Taking Institutions Act) and the criminal statutes of the U.S., exchanged assignor's deposits for dollars, pounds and euros, and through the instrumentality of the international wire system, wired the converted funds disguised as "management service fees" to defendant IBS. Defendants then used assignor and other depositor funds to acquire defendant GN-IL bank in Chicago, as well as acquiring other personal assets in the U.S.

174. In or about July 2018, defendants breached the contract. Instead of quarterly payments as agreed, defendants unilaterally "restructured" and modified the agreement, telling assignor her accrued gains would not be paid quarterly, but rather "reinvested" with her principal. Defendants further breached the agreement by imposing an unsolicited and unilateral "new

payment plan" on assignor which called for a 3-year pay out period commencing from 2019.

175. Since informing assignor of the above, assignor has demanded a return of her deposited funds, plus any accrued interest, gains, income and profits. Defendants Gold Coast and each of them have failed and continue to fail to return assignor's funds.

176. As a direct and proximate result of the breach of the agreement by defendants and each of them, assignor and plaintiff have been damaged in a sum as yet to be fully ascertained, but which will be proven at trial, representing the value of assignor and assignee's principal, accrued interest, gains, and costs.

**Fourth Cause of Action**
**(Fraud Against All Defendants)**

177. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

178. On or about November 23, 2017, plaintiff's assignor went to defendant Gold Coast's Sakumono Branch to open an account. She was presented with account opening application forms by the manager and representative of defendants. After going over the forms with assignor, the manager told assignor it was not necessary for her to check any of the "Types of Investments" boxes at the top of the form because by directives of the management, board, and CEO of defendant Gold Coast, Paa Kwesi Nduom, all Gold Coast's investor deposit accounts were invested in secure, low risk investments, including Bank of Ghana Treasury paper.

179. The manager also told assignor her account deposit would be segregated as her own and that she did not have to check any of the boxes under the "Risk Assessment Questionnaire" or

the portion relating to information on investment plan. This, the manager explained, was because the deposited funds would be invested in accordance with Gold Coast management directives, portfolio investment plans, and investment strategies which mandated customer funds be conservatively and prudently invested.

180. Plaintiff's assignor was also told, and she checked the box indicating that her expected returns would be paid each 91st day and that upon maturity, her principal would be rolled over with weekly prevailing interest rates applied to it.

181. At the time defendants Gold Coast, its board, management and shareholders, by and through its branch manager, made these representations to plaintiff's assignor, defendants knew them to be false; they also knew they had no intention of segregating assignor's funds; no intention of investing them as described and promised, or for that matter performing the terms of the deposit account agreement or any of the oral promises made on defendants' behalf by the branch manager.

182. Defendants, by and through their representative branch manager, intended that plaintiff's assignor rely on these representations in making her decision to open the investment account.

183. Plaintiff's assignor reasonably relied on defendants' representations, based on the fact that defendant Gold Coast was a duly licensed, registered financial services company regulated by the Bank of Ghana. The trust and justifiable reliance also stemmed from the fact defendant Nduom was a public figure, a former minister of government who made regular public appearances in both print and visual media touting the benefits of investments in

defendant Gold Coast.[7]  In fact, prominently displayed on the application forms beneath defendant Gold Coast's Cross-like logo was the tag line: "Investment advice worth its weight in Gold", a promise which signified and conveyed to assignor the assurance of financial security, confidence, verity, restraint, prudence, and perhaps more significantly, Christ-like fidelity – none of which, it sadly turned out, was remotely true.

184.   Further, at the time defendants made the foregoing representations, defendants knew they intended to commingle assignor's funds with other depositor funds, aggregate said funds, and knew they had no intention to invest the funds in secure government or any other conservative instruments as promised.  Rather, they intended to convert the funds to defendants' own personal use and benefit by exchanging the funds for dollars, pounds and euros, and fraudulently wiring the exchanged funds disguised as "management service fees" to defendants' related shell company IBS, and to purchase defendant bank, GN-IL, as well as other personal properties and assets in the U.S.

185.   As a direct and proximate result of defendants' fraudulent conduct, assignor and plaintiff have been injured in a sum not yet ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

### Fifth Cause of Action
### (Intentional Misrepresentation Against All Defendants)

---

[7]  It is instructive that Groupe Nduom's portfolio of sixty or more companies include a newspaper, **"*Today*"** and a Television station, **"*First Digital TV*"**, providing an unfettered platform and ample opportunity for such appearances.

186. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here

187. Defendants and each of them by and through their representative branch manager, represented to assignor that they were legitimately in the business of investment funds management. In exchange for her opening the account and depositing her life savings, defendants promised that assignor's funds would be safely invested in conservative and low risk financial instruments, and that she would receive returns each 91st day following the opening of the account; and her matured principal would be rolled over with interest.

188. Defendants and each of them, intended that assignor rely on their representations in deciding to open the account at Gold Coast.

189. Assignor reasonably relied on defendants' representations as alleged: Gold Coast was a registered and licensed brokerage and investment house; its Chairman Nduom was a public figure, a former minister of government who constantly and regularly appeared through both print and visual media indefatigably promoting the bona fides of his company, Gold Coast; likening himself to the legendary American investor, business magnate and philanthropist, Warren Buffet – the sage of Omaha – and broadcasting the prudence of investing in his numerous eponymous companies and ventures.

190. Contrary to defendants' representations, assignor's funds were not invested but commingled with other deposits, converted and thereafter exchanged for foreign currency, and in violation of both Ghana and U.S. laws, disguised and laundered as "management service fees", and wired to defendants' shell company IBS, for the benefit of defendants.

191. Defendants also used assignor's funds to acquire defendant GN-IL, a federally chartered

financial institution operating in Chicago, and acquired other personal assets and properties in the U.S.

192.     As a direct and proximate result of defendants' fraudulent conduct, assignor and plaintiff have been injured in a sum not yet ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

## Sixth Cause of Action
### (Negligent Misrepresentation Against All Defendants)

193.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

194.     Defendants and each of them had no reasonable grounds for believing the representations were true when they made them.

195.     As a direct and proximate result of defendants' fraudulent conduct, assignor and plaintiff have been injured in a sum not yet ascertained, but which will be proved at trial.

## Seventh Cause of Action
### (Fraud by Concealment Against All Defendants)

196.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

197.     As alleged above, defendants commingled depositors' funds, did not invest assignor's funds as promised, converted the funds and used them for their own benefit. Furthermore, defendants concealed the fact the deposited funds would be converted, exchanged for dollars, euros and pounds, disguised as fraudulent unearned "management service fees" and paid out to and for the benefit of its related sham company, IBS with the latter serving as a

conduit for defendants' fraud.

198. Among other things, defendants also deliberately concealed its self-dealing among the various related entities and the fact defendant Gold Coast did not have the financial and capital resources, professionally trained money managers and support staff, adequate liquidity, and appropriate risk management controls to properly run an investment brokerage business. In short, defendants failed to disclose to assignor that defendant Gold Coast was not equipped to perform and provide its advertised services, functions, duties and obligations, including complying with laws and regulations mandated by its regulators.

199. The disclosure of the foregoing facts would have been necessary for assignor to make an informed decision to open the account, deposit her life savings with defendants and to make the investment which is now the subject of this action. Defendants' suppression and concealment of these facts, in the context of other information Gold Coast provided assignor, constitutes fraud and deceit.

200. As a direct and proximate result of the knowing suppression of the relevant facts by defendants Gold Coast and each of them, assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

## Eighth Cause of Action
## (Negligence Against All Defendants)

201. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

202. Defendants owed assignor a duty of care to prudently, wisely and properly place assignor's life savings in secure low risk and conservative investments as promised.

203. Defendants breached their duty of care, and were negligent in allowing assignor's investment funds to be lost, stolen and transmuted into the personal property of defendants and each of them.  The breach of their duty of care is further evidenced by the fact defendants violated statutes, laws, regulations and other directives which were enacted, adopted and designed to protect assignor and other depositors from the very acts defendants negligently engaged in.  Thus, defendants' violations constitute negligence *per se.*

204. Based on defendants' negligence, assignor and plaintiff have been harmed including, but not limited to, the loss of the deposited funds defendants are unable to recover and return.

205. Defendants' negligence was a substantial factor in causing assignor and plaintiff's harm. And as a direct and proximate result of defendants' negligence, assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial.

**Ninth Cause of Action**
**(Conversion Against All Defendants)**

206. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

207. In November and early December 2017, assignor deposited her life savings into the investment account portfolio of defendant Gold Coast which agreed to invest the funds in safe, secure and low risk financial instruments and investments.

208. Contrary to the agreement to so invest the funds, defendants and each of them intentionally exchanged the deposited amount into dollars, pounds and euros, and without assignor's consent and or agreement, and in violation of Ghana banking laws and U.S. criminal

statutes, wired the funds to defendants' sham and shell company IBS disguised as payment for fraudulent and spurious unearned "management service fees", thereby substantially interfering with plaintiff assignor's property.

209. Since July 2018, assignor has demanded the return of her funds and property, but defendants and each of them have refused and continue to refuse to return assignor's funds.

210. Defendant Gold Coast's refusal and or failure to return assignor's funds has harmed assignor and her assignee plaintiff herein, in that it has resulted in the loss of assignor's life savings, loss of use of the funds, loss of accrued interest, gains, income and profits on the funds converted by defendants Gold Coast and each of them.

211. The conduct of defendants Gold Coast and each of them was a substantial factor in causing plaintiff's assignor's harm and financial loss. And as a direct and proximate result of defendants' conversion, assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

## Tenth Cause of Action
### (Intentional Interference with Contractual Relations Against Nduom Defendants And International Business Solutions, LLC)

212. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

213. Following the deposit of assignor Amanpene-Sekyere's funds with defendant Gold Coast, defendants and each of them intentionally interfered with the contract between assignor and Gold Coast.

---

214.    Defendants and each of them knew there was a contract between assignor and Gold Coast. The contract required Gold Coast to invest her deposited funds in secure and safe equities and securities, and repay her with returns on her investment.

215.    Notwithstanding knowing the existence of the contract between assignor and Gold Coast, defendants prevented Gold Coast from performing the terms of the contract and or made performance more expensive or difficult by interfering with the contract.  Defendants interfered by taking the funds and exchanging it into dollars, pounds and euros, and wiring same out of defendant Gold Coast's accounts and out of the country.

216.    Defendants intended to disrupt the performance of the contract or knew that disruption of the performance was certain or substantially certain to occur.

217.    Defendants' conduct was a substantial factor in causing plaintiff's harm.  And as a direct and proximate result of defendants' intentional interference, assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

### Eleventh Cause of Action
### (Intentional Interference with Prospective Economic Advantage and Relations Against Nduom Defendants And International Business Solutions, LLC)

218.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

219.    Defendants intentionally interfered with an economic relationship between defendant Gold Coast and plaintiff's assignor that would have resulted in an economic benefit to her and to plaintiff.

220. Defendants and each of them knew there was an economic relationship that probably would have resulted in an economic benefit to plaintiff's assignor in that assignor would have received, at a minimum, interest income on her deposit and or significant return on her investment.

221. Notwithstanding knowing the existence of an potentially profitable economic relationship between assignor and Gold Coast, defendants interfered with the relationship by looting the funds on deposit from Gold Coast and exchanging it into dollars, pounds and euros, and wiring same out of defendant Gold Coast's accounts and out of the country.

222. Defendants intended to disrupt the advantageous economic relationship by their conduct or knew that disruption of the relationship was certain or substantially certain to occur; and in fact the relationship was disrupted by defendants' conduct causing harm to plaintiff assignor and plaintiff.

223. Defendants' conduct was a substantial factor in causing plaintiff's harm. And as a direct and proximate result of defendants' intentional interference, assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

## CAUSES OF ACTION ARISING FROM DEFENDANTS' UNLAWFUL ACTS AGAINST NANA KWAME TWUM BARIMAH

### Twelfth Cause of Action
### (Breach of Contract Against Defendant GN BANK)

224. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

225.  At all times material hereto, plaintiff's assignor, Nana Kwame Twum Barimah, (Barimah) entered into a written and oral agreement with defendant GN-GH whereby Barimah agreed to open an account defendants GN-GH's Akim Oda Branch.  The segregated account was a depository for his earnings. The written agreement is currently in possession of defendants.

226.  The parties agreed that defendant GN-GH would maintain the funds on deposit, and upon request by check, branch teller or through defendants' ATM network, assignor would withdraw funds from his account.

227.  Contrary to the agreement, defendants commingled assignor's funds with other depositor funds and converted the funds to their own use and benefit.  Defendants GN-GH and each of them, in violation of the banking laws of Ghana, specifically Act 930, (Banks and Specialised Deposit-Taking Institutions Act) and the criminal statutes of the U.S., exchanged the funds for dollars, pounds and euros and through the international wire system, wired the converted funds disguised as "management and service fees" to defendants' related sham company, defendant IBS.  Defendants also used assignor's funds to purchase defendant GN-IL, a federally chartered bank in Chicago, as well as acquiring other personal assets in the U.S.

228.  In or about July 2019, defendant GN-GH breached the contract.  Defendants GN-GH and each of them have refused and continue to refuse to provide assignor access to his funds of approximately $30,000.   Plaintiff's assignor has appeared at defendants' branches on numerous occasions since July 2019 to withdraw funds from his account.  Notwithstanding his requests, defendants GN-GH and each of them have refused to return his funds.

229.    As a direct and proximate result of the breach of the agreement by defendants and each of them, assignor and plaintiff have been damaged in a sum as yet to be fully ascertained, but which will be proven at trial, representing the value of plaintiff-assignee's principal, accrued interest, gains and costs.

## Thirteenth Cause of Action
### (Fraud Against All Defendants)

230.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

231.    In or around December, 2016, plaintiff's assignor, Barimah met with the branch manager of defendant GN-GH's Akim Oda branch to open a bank account. Barimah was provided a new account application form to fill out. Barimah was informed by the branch manager that any funds deposited in his account would be maintained in an account under his name. Specifically, the manager informed Barimah his deposits would be safe; that he would always have ready access to his funds; that he could either issue a check on the account, execute electronic money payments; appear at the branch teller to withdraw his funds; or using his ATM card, make withdrawals from any of defendant GN-GH's network of ATMs.

232.    Plaintiff's assignor was also told he could be the beneficiary of a new financial service which allowed depositors' funds to be transferred into a secondary interest-bearing account, and that he could close the account any time with his balance remitted to him whenever he demanded.

233.    At the time defendants GN-GH, its board, management and shareholders, by and through its branch manager, made these representations to plaintiff's assignor, defendants knew them

to be false. Defendants GN-GH and each of them had no intention of maintaining the funds for assignor's use and benefit, or performing the terms of the account agreement.

234. Defendants and each of them, by and through their representative branch manager, intended that plaintiff's assignor rely on these representations in deciding to open the account.

235. Plaintiff's assignor reasonably relied on defendants' representations, based on the fact that defendant GN-GH was a duly licensed, registered deposit taking financial institution regulated by the Bank of Ghana. The trust and justifiable reliance also stemmed from the fact defendant and CEO Nduom was a public figure, a former minister of government who made regular public appearances in both print and visual media touting the services of his eponymous bank.

236. Further, at the time defendants made the foregoing representations, defendants knew they intended to convert assignor's funds by aggregating the funds with other depositors' funds; not maintain the funds solely for the benefit and use of assignor, but rather to appropriate the funds for defendants' own personal use and benefit by exchanging the funds for dollars, pounds and euros, and fraudulently wiring the exchanged funds disguised as "management service fees" to defendants' shell company IBS and to invest in and or purchase defendant bank, GN-IL, and acquire other assets and properties in the U.S.

237. As a direct and proximate result of defendants' fraudulent conduct, assignor and plaintiff have been injured in a sum not yet ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

**Fourteenth Cause of Action**

**(Intentional Misrepresentation Against All Defendants)**

238.   Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

239.   Defendants and each of them by and through their representative and branch manager, represented to plaintiff's assignor Barimah that they were legitimately in the business of banking under the rules and regulations of the Bank of Ghana.  In exchange for his opening the deposit account, defendants represented that assignor's funds would be safe, secure and readily available to him for withdrawal.

240.   Defendants and each of them intended assignor Barimah to rely on their representations in opening the deposit account at defendant GN-GH's Akim Oda branch.

241.   Assignor reasonably relied on defendants' representations: GN-GH was a registered and licensed deposit taking financial institution; its CEO Nduom was a public figure, a former minister of government who constantly and regularly appeared through both print and visual media touting the bona fides and innovative products of his eponymous company, GN Bank.

242.   Contrary to defendants' representations, assignor's funds were not maintained for his sole use and benefit, but commingled with other deposits, appropriated and exchanged for foreign currency, and in violation of both Ghana and U.S. financial transactions laws and criminal statutes, disguised and laundered as "management service fees", and wired to defendants' shell company IBS, for the benefit of defendants and each of them.

243.   Defendants also used assignor's funds to invest in the acquisition of defendant GN-IL, a federally chartered bank in Chicago, as well as acquiring other assets and properties in the U.S.

---

244. As a direct and proximate result of defendants' fraudulent conduct, assignor and plaintiff have been injured in a sum not yet ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

**Fifteenth Cause of Action**
**(Negligent Misrepresentation Against All Defendants)**

245. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

246. Defendants and each of them had no reasonable grounds for believing the representations were true when they made them.

247. As a direct and proximate result of defendants' fraudulent conduct, assignor and plaintiff have been injured in a sum not yet ascertained, but which will be proved at trial.

**Sixteenth Cause of Action**
**(Fraud By Concealment Against All Defendants)**

248. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

249. As alleged above, defendants commingled depositors' funds, did not maintain assignor's funds as promised; and defendants appropriated the funds for their own benefit. Furthermore, defendants concealed the fact the deposited funds would be converted, exchanged for dollars, pounds and euros, disguised as fraudulent, unearned "management service fees", and paid out to and for the benefit of its related sham company IBS.

250. Defendants also deliberately concealed its self-dealing among the various related entities and the fact defendant GN-GH did not have the financial and capital resources, professionally

trained banking and support staff, adequate liquidity, and appropriate risk management controls to properly run a bank. In short, defendants failed to disclose to plaintiff's assignor that defendant GN-GH was not equipped to perform and provide its advertised services, functions, duties and obligations, including complying with laws and regulations mandated by its regulators.

251.    The disclosure of the foregoing facts would have been necessary for assignor to make an informed decision in opening the account. Defendants' suppression and concealment of these facts, in the context of other information defendant GN-GH provided assignor, constitutes fraud and deceit.

252.    As a direct and proximate result of the knowing suppression of the relevant facts by defendants GN-GH and each of them, assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

**Seventeenth Cause of Action**
**(Negligence Against All Defendants)**

253.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

254.    Defendants and each of them owed plaintiff's assignor a duty of care to prudently, wisely and properly maintain his salary deposits and accounts and to ensure its ready availability to him when needed and as promised.

255.    Defendants and each of them breached their duty of care, and were negligent in allowing

assignor's funds to be lost, stolen and transmuted into the personal property of defendants and each of them. The breach of the duty of care is further evidenced by the fact defendants violated statutes, laws, regulations and other directives which were enacted to protect assignor and other depositors from the very acts in which defendants negligently engaged. Thus, defendants' violations constitute negligence *per se.*

256. Based on defendants' negligence, assignor and plaintiff have been harmed, including, but not limited to the loss of the deposited funds defendants are unable to recover and return to assignor and plaintiff.

257. Defendants' negligence was a substantial factor in causing plaintiff's assignor and plaintiff's harm, and as a direct and proximate result of defendants' negligence, the assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial.

## Eighteenth Cause of Action
### (Conversion Against All Defendants)

258. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

259. In or around December 2016, Plaintiff's assignor opened an account and directed his employer to deposit his monthly earnings into it. The funds were to be maintained in the account for the sole benefit and use of assignor Barimah, and be made readily available upon request at a teller or through the use of defendant GN-GH's network of ATMs.

260. Contrary to the agreement to maintain the funds, defendants and each of them intentionally appropriated the funds, exchanged the funds into dollars, pounds and euros, and without

assignor's consent and or agreement, and in violation of Ghana and U.S. banking laws and criminal statutes, wired the funds to defendants' shell company, IBS as payment for fraudulent and spurious unearned "management and service fees", thereby substantially interfering with assignor's property.

261. Since July 2019, assignor has demanded the return of his funds and property, but defendants have refused and continue to refuse to return assignor's deposited funds.

262. Defendant GN-GH's refusal or failure to return assignor's funds, has harmed assignor and his assignee, plaintiff herein, in that it has resulted in the loss of assignor's savings, loss of use of his funds, accrued interest and income on those funds converted by defendants.

263. The conduct of defendants GN-GH and each of them was a substantial factor in causing plaintiff assignor's harm and financial loss, and as a direct and proximate result of defendants' conversion, assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

### Nineteenth Cause of Action
### (Intentional Interference with Contractual Relations Against Nduom Defendants And International Business Solutions, LLC)

264. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

265. Following the deposit of assignor Barimah's funds with defendant GN-GH, defendants and each of them intentionally interfered with the contract between assignor and GN Bank, Ghana.

266. Defendants and each of them knew there was a contract between assignor and GN Bank. The contract required GN Bank to receive assignor's salary either by direct deposit or other means and hold the deposit as trustee and assignor's bank, for and on behalf of assignor and pay it out whenever assignor so demanded.

267. Notwithstanding knowing the existence of the contract between assignor and GN Bank, defendants prevented GN Bank from performing the terms of the contract and or made performance more expensive or difficult by interfering with the contract. Defendants interfered by taking the deposited funds and exchanging it into dollars, pounds and euros, and wiring same out of defendant GN Bank's accounts and out of the country.

268. Defendants intended to disrupt the performance of the contract or knew that disruption of the performance was certain or substantially certain to occur.

269. Defendants' conduct was a substantial factor in causing plaintiff's harm. And as a direct and proximate result of defendants' intentional interference, assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

**Twentieth Cause of Action**
**(Intentional Interference with Prospective Economic Advantage and Relations Against Nduom Defendants And International Business Solutions, LLC)**

270. Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth here.

271. Defendants intentionally interfered with an economic relationship between defendant GN Bank and plaintiff's assignor that would have resulted in an economic benefit to him and to

plaintiff.

272.    Defendants and each of them knew there was an economic relationship that probably would have resulted in an economic benefit to plaintiff's assignor in that assignor would have received interest income and related ancillary benefits on his deposit.

273.    Notwithstanding knowing the existence of an potentially profitable economic relationship between assignor and GN Bank, defendants interfered with the relationship by looting the funds on deposit from GN Bank and exchanging it into dollars, pounds and euros, and wiring same out of defendant GN Bank's accounts to the U.S. for their own benefit.

274.    Defendants intended to disrupt the advantageous economic relationship by their conduct or knew that disruption of the relationship was certain or substantially certain to occur; and in fact the relationship was disrupted by defendants' conduct causing harm to plaintiff assignor and plaintiff.

275.    Defendants' conduct was a substantial factor in causing plaintiff's harm.  And as a direct and proximate result of defendants' intentional interference, assignor and plaintiff have been injured in an amount as yet to be fully ascertained, but which will be proved at trial. Furthermore, plaintiff is entitled to punitive and exemplary damages on account of defendants' fraud, malice, and oppressive conduct.

## VI.
## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief as set forth below.

1.      On plaintiff's Federal Civil RICO causes of action for money laundering, mail, wire fraud and related predicate acts, award treble compensatory damages, as well as

consequential, exemplary and punitive damages in an amount to be determined at trial;

2. On plaintiff's Federal Civil RICO causes of action for money laundering, mail, wire fraud and related predicate acts, award attorneys' fees and costs;

3. On plaintiff's third and twelfth causes of action (Breach of Contract), for general and consequential damages according to proof;

4. On plaintiff's fourth, fifth, sixth, seventh, thirteenth, fourteenth, fifteenth and sixteenth causes of action (Fraud), for general damages according to proof and punitive and exemplary damages on account of defendants' fraud, malice and oppression;

5. On plaintiff's eighth and seventeenth causes of action (Negligence), for general and consequential damages according to proof;

6. On plaintiff's ninth and eighteenth causes of action (Conversion), for general damages according to proof and punitive and exemplary damages on account of defendants' malice and oppression;

7. On plaintiff's tenth, eleventh, nineteenth and twentieth causes of action (Economic and Contract Interference) for general damages according to proof and punitive and exemplary damages on account of defendants' malice and oppression.

7. For extraordinary equitable and or injunctive relief as permitted by law, equity, and statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' illegal and criminal activities or their other assets so to assure plaintiff has an effective remedy;

7.     Awarding plaintiff restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants, including all ill-gotten gains from their illegal and criminal activities;

8.     Awarding plaintiff the costs of suit, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

9.     Prejudgment interest as provided by law;

10.    Interest upon any judgment entered as provided by law; and

11.    For such other and further relief as the Court deems just and proper.

## VII.
## JURY TRIAL DEMAND

Plaintiff demands trial by jury on actions so triable.

Dated: November 17, 2020                    **SCHWARTZ & ASIEDU, LAWYERS**

                                            By: */s/Kwasi A. Asiedu*
                                            Kwasi A. Asiedu  (CA Bar No. 133698)
                                            8383 Wilshire Boulevard, Suite 363
                                            Beverly Hills, California 90211
                                            Telephone:  (310) 792-3948
                                            Facsimile:   (561) 423-5969
                                            Email: asiedu@outlook.com

                                            **McMILLAN & HERRELL**

                                            Shelly D. McMillan  (CA Bar No. 136618)
                                            Matthew B. Herrell (CA Bar No. 146242)
                                            8383 Wilshire Boulevard, Suite 363
                                            Beverly Hills, California 90211
                                            Telephone: (323) 951-0060
                                            Facsimile:   (323) 951-0061
                                            Email: mcmillanandherrell@hotmail.com

                                            *Attorneys for Birim Group, LLC*

---